IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE


| | | |
|---|---|---|
| **BEATY CHEVROLET COMPANY,** ) | | |
|     Plaintiff, ) | | |
| ) | | |
| **v.** ) | 3:03-cv-442 | |
| ) | | |
| **NORFOLK SOUTHERN RAILWAY** ) | | |
| **COMPANY,** ) | | |
|     Defendant. ) | | |

## MEMORANDUM OPINION

Defendant, Norfolk Southern Railway Company (NSRC), has moved for summary judgment [Docs. 22, 33, 34]. Plaintiff, Beaty Chevrolet Company (Beaty), has filed a responsive brief [Doc. 47]. NSRC has filed a reply [Doc. 51]. For the reasons that follow, NSRC's dispositive motion is hereby **GRANTED**.

## BACKGROUND

The Beaty dealership is located at 9615 Parkside Drive in Knoxville, Tennessee. The Farragut, Tennessee train derailment site is located approximately five (5) miles southwest of the dealership.[1] Among the railcars damaged in the Sunday, September 15, 2002 derailment was a tanker containing 10,600 gallons of fuming sulfuric acid, also

---

[1]As a precaution, the Knox County Emergency Management Agency ordered an evacuation within 1.3 miles of the derailment site at Brixworth Avenue on NSRC's track running between Turkey Creek Road and Fort Loudon Lake. Apparently, the evacuation area was never expanded beyond that original distance.

known as oleum.[2] Plaintiff claims that after the derailment, "sulphuric acid fell on the plaintiff's business premises, causing damage to approximately 248 automobiles and trucks...." Fuming sulfuric acid is a mixture of sulfuric acid and sulfur trioxide. Upon exposure to water or moisture, the sulfur trioxide rapidly combines to form sulfuric acid.

According to plaintiff, on Saturday, September 14, 2002, Beaty had a black Chevrolet Tracker inside its showroom. After a customer test-drove the vehicle, it was left outside for the remainder of the weekend, as the dealership is closed on Sundays. On or about Monday, September 16, or Tuesday, September 17, Danny Ballinger (Ballinger), Beaty's Body Shop foreman, claims he noticed pits and blemishes on painted surfaces and plastic trim on some of the vehicles in plaintiff's inventory, including the aforementioned Tracker. Ballinger asserts he then discovered that substantially all of the vehicles positioned on outside lots during this time period had the same damage. Vehicles housed inside, such as demonstration and loaner vehicles, were not damaged. Additionally, one vehicle parked partially under an overhang extending from the Beaty building was allegedly damaged only on areas not covered by the overhang. According to Beaty, the damage to its vehicles was not consistent with damage caused by acid rain. In fact, Beaty states it has never experienced any acid rain or such related type of damage to any of its vehicles.

---

[2] In this case, almost all of the fuming sulfuric acid liquid was spilled from the tank car. A portion of this liquid was absorbed by the surrounding soil, the limestone track bed and by the contents of other railcars (containing agricultural lime, limestone, and flour). Some of the acid was not absorbed and formed a pool of liquid under the derailed tanker.

2

At approximately 5:30 p.m. on September 15, six hours after the chemical release, an NSRC response contractor, the Center For Toxicology and Environmental Health (CTEH) led by Dr. Glenn Millner (Millner), arrived at the derailment site and began setting up a portable weather station to monitor relevant readings at the scene.[3] According to defendant, CTEH also set up ten continuous air monitors at the perimeter of the site to look for the presence of sulfuric acid in the air. CTEH then provided continuous 24-hour air monitoring beginning on the evening of September 15 and continuing until September 20. Defendant claims CTEH properly conducted real-time air sampling, monitored meteorological conditions, conducted surface wipe sampling, and collected integrated air samples using established methods in order to honestly assess potential worker and community exposures to the sulfuric acid released at the derailment site. NSRC asserts CTEH correctly interpreted the levels of air concentration of sulfuric acid in more than 450 air samples. NSRC notes that only six (6) samples contained detectable levels of sulfuric acid, and the highest measurement taken, collected directly in the sulfuric acid plume within 50 yards of the leaking tanker, was still below established Federal health guidelines.

Beaty notes that the specific focus of Dr. Millner's work at the derailment site was to evaluate the risk to human health, not the risk to property. Plaintiff stresses that

---

[3]Beaty asserts that Dr. Millner is one of the owners of CTEH, which works for every Class 1 railroad in North America. According to plaintiff, a large percentage of CTEH's business is done on behalf of railroads, CTEH has worked for NSRC on at least five occasions, and the company has a standing contract to perform emergency response work for NSRC.

3

no air samples had been taken at the accident site until CTEH arrived. By that time, the tanker had been releasing water vapor containing sulfuric acid for six hours. Thus, Beaty asserts that Dr. Millner does not know how much material was released prior to his arrival. Further, plaintiff states that Dr. Millner did not calculate the release rate of chemical from the tanker in question. However, plaintiff contends that even if Dr. Millner had made such a calculation, he would not know how much of the chemical escaped into the atmosphere versus the amount on the ground. Additionally, Beaty asserts Dr. Millner does not know the concentration of sulfuric acid already present in the air prior to his arrival six hours after the derailment.

On the morning of September 16, at 2:00 a.m., two large water streams were applied to the area around the derailed tanker. The water apparently had the effect of converting the sulfur trioxide to sulfuric acid and prevented any further appreciable release of sulfuric acid into the atmosphere. By 5 a.m., all fuming west of the tanker had stopped and by 9:30 a.m., all fuming outside of the tanker itself had ceased.

NSRC claims that during the entire period between 11:40 a.m. on September 15, 2002 and 9:30 a.m. on September 16, 2002, records reveal the surface wind direction at the derailment site was either calm or consistently blowing towards the southwest, south, southeast or east. Thus, NSRC argues the surface winds did not blow toward the Beaty dealership for any significant period of time. According to the defendant, the wind direction at the derailment site for the relevant period has been documented by National Weather Service data, the on-scene weather station set up and operated by

CTEH under the direction of Dr. Millner, and numerous photographs and videos taken by the responders and news media.

Mr. Gale Hoffnagle (Hoffnagle)[4] has opined that the damage to Beaty's vehicles was caused by acid rain, since "eastern Tennessee is the area of the country with the most acidic rainfall of anywhere in the nation." Hoffnagle did state that acid rain might be the cause of the damage if there was some source of sulfur dioxide "directly upwind of the plaintiff's location on the 15th and 16th of September." He further admitted that he cannot rule out some impact at the Beaty dealership from the release of the sulfuric acid at the derailment site. Interestingly, Hoffnagle testified that the meteorological information from the CTEH instrument set up at the derailment site was not helpful to him because it only showed conditions at or near ground level, and, therefore, was not relevant to the manner in which the plume traveled over a distance. To determine wind direction, Hoffnagle states he used data from the weather station at McGhee Tyson Airport and the National Weather Service station in Nashville. He agrees that the winds on September 15, 2002 were variable. The data from the Nashville station for September 15, 2002, apparently shows winds from the south at 6:00 a.m. and from the east at 6:00 p.m.

NSRC also claims that on the day of the accident and for several days thereafter, there were equally probable causes of acidic deposition at the Beaty dealership from

---

[4]Beaty asserts that Hoffnagle, another one of defendant's experts, has been hired by NSRC's counsel on a number of occasions.

TVA's Bull Run Power Plant, located approximately 13 miles north-northwest of the Beaty dealership. Hoffnagle indicates that on September 15, the 304,966 pounds of sulfur dioxide emissions from the power plant was the highest total for the month; September 16 reveals the second highest daily total (281,976 pounds) and September 17 shows the third highest daily total (277,063 pounds). Accordingly, defendant asserts Beaty's location directly downwind of the Bull Run Power Plant is particularly significant for the relevant time frame at issue. Additionally, according to defendant, radar loops show that rainfall during the relevant period was moving from the northwest to southeast (*i.e.*, from Bull Run Power Plant toward plaintiff's dealership).

Defendant asserts it is especially significant that there is no evidence that the released chemical was deposited at any point between the derailment site and the Beaty dealership. Because the derailment occurred on the north shore of Lake Loudon, the residential neighborhoods tested by Dr. Millner and CTEH were to the north, northeast, and northwest of the accident site, in the general direction of the Beaty dealership. Accordingly, if the claims of plaintiff are to be accepted, the court must find that the released chemical somehow was transported from the accident site and and deposited only at a single location, the Beaty dealership, and not at any other location in between.

## SUMMARY JUDGMENT

Fed. R. Civ. P. 56(e) provides that summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

6

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). Thus, as long as the movant has met its initial burden of "demonstrating the absence of a genuine issue of material fact," *id.* at 323, the nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "If the nonmoving party is unable to make such a showing, summary judgment is appropriate." *Id.* at 353. "The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986).

While Beaty alleges its damages are "a direct and proximate result of the aforementioned negligence of the defendant," NSRC contends that under Tennessee law, Beaty must establish the following elements in order to prevail in a negligence claim: "1) a duty of care owed by the defendant to the plaintiff; 2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty, 3) an injury or loss; 4) causation in fact; and 5) proximate, or legal, causation." *Staples v. CBL & Associates, Inc.*, 15 S.W.3d 83, 89 (Tenn. 2000). NSRC asserts Beaty cannot establish the fourth element – that the dilute sulfuric acid released during the derailment was the cause in fact of the alleged damage at the dealership. Beaty must further show

7

that there was some means by which airborne sulfuric acid of sufficient concentration could have been transported to the Beaty dealership.

As easy as it would be to just "blame" NSRC for this acid damage occurring around the same time as the train derailment, after reviewing the evidence of record, the court must conclude that Beaty has presented no credible evidence that the sulfuric acid released at the derailment site found its way to and targeted only this dealership. The wind evidence does not support the conclusion that any sulfuric acid blew from the derailment site toward the dealership for any significant period of time. The experts have opined that there is no way to determine whether the sulfuric acid came from rain or the chemical spill. Additionally, other possible credible causes for the acidic deposition have been demonstrated. In order to find for the plaintiff, a jury would be required to speculate regarding the source of the chemical release. The evidence presented just does not reveal that Beaty's factual scenario is any more likely than the versions introduced by the defendant. *See Irwin v. Odyssey Contracting Corp.*, 61 Fed. Appx. 150; 2003 U.S. App. LEXIS 4809 (6th Cir. March 13, 2003). Thus, the court must find that NSRC is entitled to summary judgment as a matter of law.

**ORDER TO FOLLOW.**

             **ENTER:**

             <u>**s/Thomas W. Phillips**</u>
             **UNITED STATES DISTRICT JUDGE**